JoNes, Chief Judge,
dissenting in part:
I agree that plaintiff should recover on the basis of the 10 planes to which title had passed and which were taken from him by the defendant.
I do not think he should recover for the 20 remaining planes which were never delivered.
It seems apparent that on July 1, 1948, defendant had probable cause to believe that the foreign policy of the United States was in danger of being violated in the resale of some of the planes which had been delivered to plaintiff, or at least sufficient facts to put it on inquiry and to justify temporary suspension of deliveries. In addition to the photograph which appeared in the London newspaper, there existed some doubt as to the nature of the activities of the Somaco firm to which plaintiff had sold the planes. Plaintiff’s failure to cancel his CAA registrations on the resale of the planes also raised some question. At or about July 1 it was also learned that Fred Lewis (Tursz-Fredkens) with whom plaintiff had been dealing in his negotiations with Somaco was the European representative for aviation purposes for the State of Israel.
By December 1948, when plaintiff returned to Paris following negotiations with the Department of State which resulted in an amendment of his contract, defendant’s officials had learned that 1 of the planes delivered to plaintiff had in fact been flown into Czechoslovakia with further facts indicating quite strongly that 5 other planes reached the same destination. These flights had taken place in July. Interviews at that time with the pilot James who had been employed by plaintiff made further deliveries to plaintiff questionable. He first stated that he flew one of the planes to Czechoslovakia under instructions of the plaintiff. In another interview a few days later he changed his story to the effect that the flight had been made at the request of and under instructions of the above-mentioned Fred Lewis.
Plaintiff’s contract was executed prior to the UN resolution condemning the exporting of war materials to the Middle East.
*14 If these planes had been located in the United States, the defendant would have prevented their use in the middle eastern war by the refusal to issue export licenses which would have been required under the Presidential Proclamation of March 27, 1948. Located in Germany as they were, the one sure means of preventing their passage to the Middle East was to not deliver the planes. Once delivered the defendant could only prevent such use through the cooperation of the other governments. That such a course would most likely not be effective is shown in this case where the defendant on request was unable to have the Dutch and French Governments prevent the removal of the already delivered planes from their countries. Plaintiff’s contract as amended still failed to solve the problem because it still would have meant that once delivered the prevention of their eventual passage to the Middle East would depend once again on governments of the countries where the planes would be delivered.
There are some things that go beyond the forms of law. When a neighbor’s house is on fire the law of trespass, important in normal times, is disregarded. It is absorbed in the higher law of self and community preservation.
The immunity of a sovereign act, as used in a free country, is not a method conjured up to escape contractual liability to individuals. That could have been easily handled by defendant’s refusing permission to be sued. It is to be invoked when the national interest is at stake.
Here was a practical condition where there was danger of world conflagration. Twice within the memory of many now living has a world tragedy been brought about by incidents of less importance. The results were immense loss of life, broken hearts and the waste of billions of treasure.
Is the nation to remain helpless in the presence of another such threat? What are responsible officials to do when face to face with such a condition ? Must they remain helpless or does it call for the action of the times ?
I believe that the Department of State was fully justified in notifying plaintiff on February 28, 1949, that no further deliveries would be made, on the ground that such deliveries would interfere with our foreign policy objectives and would *15 be contrary to tbe national interests. Horowitz v. United States, 267 U. S. 458, 461.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Richard H. Akers, and the briefs and argument of counsel, makes the following findings of fact:
1. The plaintiff is a citizen of the United States residing in Paris, France. During World War II he served as an officer in the United States Army Air Force. In June 1946, he was assigned to the Aircraft Branch of the Office of Foreign Liquidation Commissioner, Department of State (hereinafter sometimes referred to as “OFLC”), in Paris, and continued there until his military service terminated on March 20,1947.
2. At or about the time he was leaving OFLC, the plaintiff learned that instructions had just been received from the office of OFLC in Washington, D. C., to dispose of the remaining UC-64 airplanes then on hand, and that in order to effect such disposition a greatly reduced price had been fixed as compared with that at which they were previously offered. It was suggested to the plaintiff that this was a good business opportunity for someone with sufficient money to buy them. At that time the plaintiff was not financially able to make such a purchase and knew little about aircraft.
This UC-64 plane, also known as the Noorduyn-Norseman, was built in Canada by Noorduyn Aviation Limited. The design of the plane was started hi 1934 and the first successful plane of that type was flown on November 7, 1935. It was specially designed for Canadian bush operations, that is, for use in undeveloped, uncharted territory, in connection with mining, prospecting, and similar activities. It was possessed of substantial commercial utility in areas of that kind because of its adaptability to use on wheels, floats, or skis for landing, and because of its ruggedness. It could be used either to carry passengers, having space for six to eight plus a crew of two, or to carry freight, having a capacity of 1,750 to 2,000 pounds. It was a high wing monoplane powered with a Pratt and Whitney 1340 engine. Depending *16 on the fuel tanks with which it was equipped, it had a flying range of from four to twelve hours.
During the period prior to the outbreak of the war in Europe in 1939, some twenty-five of these planes had been built and sold commercially. During World War II they were acquired in considerable volume by the United States Army Air Force, the Eoyal Canadian Air Force, and the Eoyal Air Force, the United States alone purchasing about 875 of these planes. They had no combat use but were used by the armed services for carrying supplies and for flying wounded soldiers. In 1954 there were some 400 of these planes still hr operation in various countries of the world and the chief reason for the continued existence of the company which manufactured them is to supply spare parts and provide engineering services for the planes.
3. Subsequent to the termination of his service with the OFLC, the plaintiff discussed the OFLC surplus UC-64 aircraft with a number of people, including a Mr. Serge Cals, a native of Belgium, and a Mr. Victor M. Oswald, a Swiss national residing in Spam. Mr. Cals subsequently negotiated the contract involved in this proceeding between the OFLC and Mr. Oswald and referred to in finding 4.
In anticipation of entering into that contract, the plaintiff entered into an agreement with Mr. Oswald on May 14,1947, concerning the disposition of the UC-64 aircraft which Oswald was to acquire from OFLC. That agreement read as follows:
1.) The two parties named above, shall share the profits which shall occur from the sale or disposition of the aircraft (50-C-64 Nordyne Norseman) purchased from the OFLC (U. S. Surplus disposal Agency).
2.) The two parties shall assume equal responsibilities in the payment of any sums contracted for in the name of Victor M. Oswald, for the above named aircraft, or any other liabilities arising out of this entire transaction.
3.) Victor M. Oswald is to pay the sum of $30,000,— to the Commission of the OFLC within 15 days of the signing of the contract, and David M. Miller is to pay to Victor M. Oswald the sum of $15,000, — , or y2 °f the contracted amount, before Victor M. Oswald has to pay the $30,000, — .
*17 4.) The selling of the aircraft is to be performed by David M. Miller or any method mutually agreed upon by the two parties of this contract.
4. On May 21, 1947, the contract contemplated by the events referred to in the preceding finding was entered into by a representative of OFLC with Victor M. Oswald for the purchase by Oswald of fifty aircraft type UC-64A. That contract, numbered W-ANL(ETO II)-3533, provided in part as follows:
1. Subject to the following terms and conditions the Commissioner agrees to sell and the Purchaser agrees to buy the aircraft, type UC-64A, described in the Schedule “A,” attached hereto and made a part hereof.
2. The agreed purchase price payable to the Commissioner shall be $150,000.00.
3. PaymeNt : Payment for the surplus property indicated on the attached Schedule “A” shall be made by the Purchaser in the following manner:
a. Fifteen (15) days from the date of signing of this contract by Commissioner, the Purchaser shall pay to the Commissioner the sum of $30,000.00. Upon receipt of such payment, the Commissioner will, in accordance with the provisions of paragraph 6 hereof, deliver to the Purchaser five (5) of the aircraft identified on the attached Schedule “A/’
b. Upon receipt by the Purchaser of the fifth (5th) aircraft sold under this contract, the Purchaser shall pay to the Commissioner the sum of $30,000.00. Upon receipt of such payment, the Commissioner will, in accordance with the provisions of paragraph 6 hereof, deliver to the Purchaser the sixth (6th) up to and including the fifteenth (15th) aircraft to be delivered to the Purchaser.
c. Upon receipt by the Purchaser of the fifteenth (15th) aircraft sold under this contract, the Purchaser shall pay to the Commissioner the sum of $30,000.00. Upon receipt of such payment, the Commissioner will, in accordance with the provisions of paragraph 6 hereof, deliver to the Purchaser the sixteenth (16th) up to and including the twenty-fifth (25th) aircraft to be delivered to the Purchaser.
d. Upon receipt by the Purchaser of the twenty-fifth .(25th) aircraft sold under this contract, the Purchaser shall pay to the Commissioner the sum of $30,000.00. Upon receipt of such payment, the Commissioner will, *18 in accordance with the provisions of paragraph 6 hereof, deliver to the Purchaser the twenty-sixth (26th) up to and including the thirty-fifth (35th) aircraft to be delivered to the Purchaser.
e. Upon receipt by the Purchaser of the thirty-fifth (35th) aircraft sold under this contract, the Purchaser shall pay to the Commissioner the sum of $30,000.00. Upon receipt of such payment, and provided the Purchaser has fully complied with all the terms of this contract, the Commissioner will, in accordance with the provisions of paragraph 6 hereof, deliver the thirty-sixth (36th) up to and including the fiftieth (50th) aircraft to the Purchaser.
4. Title: Title to the aircraft subject to this contract shall rest in the Purchaser upon delivery, which will be accomplished as set forth in Article 6.
5. Sale “As Is” and “Wheee Is” : All property is sold “as is” and “where is” and the Commissioner makes no representation or warranty of any nature whatsoever as to condition, serviceability, or airworthiness of the aircraft subject to this contract.
6. Deliveex: a. An OFLC Disposal Document and Theater Shipping Orders will be mailed or delivered to the Purchaser upon receipt and acceptance by the Commissioner of the instrument (s) submitted in full payment under this contract. Upon receipt of the Theater Shipping Orders, the Purchaser will be entitled to take delivery of the property.
b. Delivery of the aircraft to the Purchaser will be accomplished at the place of storage indicated on the attached Schedule “A” as soon as may be practicable under all the circumstances. The Purchaser will be responsible for furnishing and paying for any transportation necessary for the removal of the property from the present place of storage. The Commissioner reserves the right, however, to elect to make delivery of the aircraft to the Purchaser at such place or places as may be mutually agreed upon.
c. The Purchaser agrees to effect complete removal of the aircraft from the place of storage indicated, within thirty (30) days after notification by the Commissioner of tlie readiness of the aircraft for flight or shipment. If the aircraft is not removed within the time herein specified, the Commissioner shall have the right to dispose of the property in manner determined best by him and to hold the Purchaser responsible for any loss resulting to the United States.
*19 d. Upon delivery of the aircraft, the Purchaser will accomplish and deliver receipts in the form and number directed by the U. S. Government representative in charge of accomplishing delivery of the aircraft to the Purchaser.
e. If the Purchaser designates an agent to accept delivery of the aircraft, the Purchaser shall give to such agent a letter authorizing him to accept delivery. Two (2) copies of the letter will be surrendered to the above mentioned U. S. Government representative at the time of delivery of the aircraft.
7. VARIATIONS IN QuaNtity: Any variation as determined by the Commissioner between the quantity of property stated as sold under this contract and the quantity of property actually delivered to the Purchaser will be adjusted upon the basis of the unit price of the items of undelivered property.
Schedule A attached to that contract listed fifty UC-64A aircraft, giving the aircraft serial number and engine number of each, stating a price of $3,000 for each plane, and stating: “Above aircraft are located at Oberpfaffenhofen, Germany.”
Prior to that date the selling price of these planes had been fixed by the Washington office of OFLC within the range of $7,000 to $10,000 each, and about thirty of these planes had been sold in Europe under that price authorization at prices ranging from $7,500 to $9,000 each. The above contract of sale to Oswald included all the planes of that type which were still held by OFLC in Europe. These planes had been flown from wherever they were located to Oberpfaffenhofen for purposes of storage and disposition.
5. The initial payment of $30,000 called for by the Oswald contract was made by Mr. Oswald at sometime between June 10 and 15,1947. Although the sales were made on an “as is” and “where is” basis, the Air Force had become concerned about the safety problems which might be encountered if the purchasers were to fly these planes out of the occupation zone where they were then located and had decided to prepare each plane so sold for one flight and to fly it out of the occupation zone to a point designated by the purchaser. That procedure was adopted initially on deliveries under this contract, the Air Force delivering the first two planes *20 in Paris as directed by the plaintiff on August 16 and September 15,1947. Thereafter deliveries were slowed down by activities at Oberpfaffenhofen arising out of the Berlin airlift and by the necessity of processing a backlog of earlier orders for planes sold from that field. The last three planes comprising the first group of five covered by the contract were not delivered at Schiphol Airdrome, Amsterdam, until about March 16,1948.
6. Late in 1947 or early in 1948, Mr. Oswald became dissatisfied with the slow rate of deliveries under the contract and with the plaintiff’s failure to sell the two planes which had already been delivered, or even to secure certificates of airworthiness for three of them and expressed a desire to withdraw from the contract. After some discussion between Oswald and the plaintiff, the following agreement was executed by them on January 15,1948:
1/ David M. Miller agrees to repay Victor M. Oswald within 30 days the sum of $15,000 — paid by Oswald to the OFLC under Contract No. W-ANL(ETO II)-3533.
2/ Victor M. Oswald agrees to assign all benefits and liabilities of this above mentioned Contract to David M. Miller, and further agrees to handle the financial transactions of payment to the US-Government through his Victor M. Oswald account No. 2 Chase National Bank, New York.
3/ David M. Miller agrees to pay to Victor M. Oswald 5% (five percent) of the net profit of this entire transaction, said percentage to be figured at the completion of the entire transaction.
4/ It is agreed that the Agreement between David M. Miller and Victor M. Oswald dated April 2nd, 1947, agreeing to percentages of profit to Oswald, Miller, Cals and friends, be declared null and void.
5/ David M. Miller confirms that with his signature he has taken over all benefits and liabilities which arise out of the above mentioned Contract and both declare that Oswald has no longer anything to do with that Contract.
6/ Victor M. Oswald agrees to put through his account the payments which have to be made to the US-Government, always when he has received the money from Miller, or any other man designated by him. If such money is not received, Victor M. Oswald is no longer liable for any payment to the US-Government.
*21 The OFLC recognized that assignment and continued to deal with the plaintiff as the contracting party throughout the remaining life of the contract. (That contract of Oswald with OFLC is hereinafter sometimes referred to as the plaintiff’s contract with OFLC.)
7. At all times material to this proceeding the United States Civil Aeronautics Authority (hereinafter sometimes referred to as “CAA”) required that all American owned and operated aircraft be registered with the CAA and thereafter be identified by the registration or NC number assigned to it. This registration was effected by the use of CAA form ACA-500 which was in three parts as follows: Part A, Certificate of Eegistration; Part B, Application for Eegistration; and Part C, Bill of Sale. In the prescribed procedure an applicant was furnished an NC number and a form ACA-500 by a local office either in this country or a foreign country which he filled out in duplicate and had notarized. The original of Part B, Application for Eegistration, was retained by the applicant and placed by him in the aircraft. At the bottom of that part of the form appeared the following notation:
If all the above statements are true and made in good faith, the aircraft herein described may be operated pending registration for 60 days provided airworthiness requirements _ of applicable civil air regulations are complied with. The original of this application (Part “B”) must be retained in the aircraft during such time.
The remainder of the form was forwarded to Washington, D. C., where registration was completed. The original of Part A, Certificate of Eegistration, upon completion, was returned to the applicant to be placed in the aircraft to take the place of Part B. This registration procedure was centralized in Washington, D. C.
The ACA forms above described were available at any one of several CAA offices throughout the United States and in Europe in London, Paris, and Berlin. The CAA office in Washington, D. C., customarily forwarded blocks of registration or NC forms to each of its various offices for their use in connection with the filing of applications for registration by local owners of aircraft. The European offices were furnished with these numbers during the time of the events *22 involved in this proceeding due to the fact that many aircraft in Europe were being sold at that time. The local office would furnish an NC number at the time an application was filed or it could be furnished even earlier if the applicant furnished the local office with sufficient identifying data concerning the plane to enable it to fill out the aircraft record card.
Under CAA procedure and regulations, the registration of the aircraft of itself did not authorize the owner to operate the plane in the air. In addition to registration, it was necessary for the owner to secure a certificate of airworthiness in order to fly the plane. This certificate of airworthiness was issued in the field by an authorized agent of the CAA after inspection of the aircraft.
8. NC numbers were duly furnished to the plaintiff for the first five aircraft which were delivered to him. On November 16, 1947, the plaintiff made application for registration of the two planes which had been delivered in Paris and which bore registration numbers NC 74138 and NC 74134. A registration certificate was issued on NC 74133 on December 2, 1947, and on NC 74134 on January 8, 1948. A certificate of airworthiness was issued on aircraft NC 74133 on November 14, 1947, and on NC 74134 on December 5, 1947. The remaining three of the first group of five planes were given NC numbers 79821, 79822, and 79823. Certificates of registration were issued for these three planes on May 25, 1948, and certificates of airworthiness on May 12,1948. All of these certificates were issued on the application of and in the name of the plaintiff, David M. Miller. These last three planes were delivered by United States Air Force pilots to Schiphol Airdrome, Amsterdam, Holland, as directed by the plaintiff, on or about March 16,1948. This was an airdrome of the Dutch Air Lines, sometimes referred to herein as KLM.
9. Subsequent to the withdrawal of Mr. Oswald from the contractual arrangements with OFLC, as heretofore shown, the plaintiff in March 1948 entered into negotiations with a Mr. Tursz-Fredkens for the sale of some of these airplanes. Tursz-Fredkens represented himself to the plaintiff as a Belgian national residing in the Belgian Congo and as the representative of Somaco, a Belgian firm of Brussels, Bel *23 gium. Tursz-Fredkens further represented to the plaintiff that Somaco desired the airplanes for export to the Belgian Congo. In these negotiations the plaintiff at first offered the airplanes at $9,000 each. However, in consideration of Somaco taking twenty planes and making immediate payment for all twenty in advance of delivery, the plaintiff reduced the price for the twenty planes to $6,500 each, which price Somaco accepted. With the funds thus received, the plaintiff was enabled to finance the balance of the purchase price of the remaining planes under his contract with OFLC and constituted one of the considerations for his acceptance of the unit price of $6,500.
In accordance with the agreement reached between the plaintiff and Somaco, the following contract of sale was entered into on March 29,1948:
It has been agreed between Mr. D. M. Miller acting by regular power of attorney on behalf of Mr. Victor Oswald and hereafter called the Seller,
and
Mr. H. Gr. Tursz-FredkeNS acting on behalf of Ste. Anonyme “Somaco” Brussels, Belgium, hereafter called the Purchaser.
.Mr. Victor Oswald sells twenty Norseman U. C. 64. A. Aircraft purchased from the O. F. L. C. under contract No. W-ANL(ETO II)-3533 at the price of $6,500,-(Six Thousand Five Hundred U. S. A. Dollars) each payable in advance into Mr. Victor Oswald’s account No. 1509 with the Union Bank oe Switzerland, Zuerich.
All aircraft are to be delivered in perfect flying order, in other words, American N. C. (C. A. A.) licensed and fitted with serviceable wireless.
The aircraft bought by the buyer are as specified hereunder:
[Here follows a list of the 20 planes purchased by aircraft and engine serial numbers, and showing the length of time each plane has been flown and the hours for the engine in each plane.]
Deliveries will be made as follows:
Two aircraft (No. NO 74133 & NO 74134) immediately on Bankers advice of payment. Three aircraft further to be delivered by Saturday tenth of April. A further seven aircraft to be delivered by May the first 1948. The eight remaining aircraft to be delivered by June the first 1948.
*24 All aircraft to be delivered at Toussus le Noble or place mutually agreed upon by the two parties of this contract.
The purchaser will further pay a deposit of fifteen thousand dollars for the purpose of securing the spare parts available as per detailed list furnished by O. F. L. C. in his possession.
Tursz-Fredkens designated the planes he desired to purchase, indicating to the plaintiff that he was doing this on the basis of information he had secured at Oberpfaffenhofen. The five planes referred to above in the first paragraph under “Deliveries” were those planes referred to in findings 5 and 8 as having been previously delivered to the plaintiff by the OFLC, and which planes Somaco took delivery of at the same respective places.
10. Pursuant to the contract set out in the preceding finding, Somaco paid the plaintiff $130,000 for the twenty planes covered by the contract, plus $15,000 for spare parts for them. These payments were made by giving to the plaintiff a check for $5,000 upon the signing of the contract on March 29, 1948, and by depositing $140,000 in Mr. Oswald’s bank account in Zurich, Switzerland, some five days later. No satisfactory evidence was introduced showing any contractual arrangement which the plaintiff had with OFLC for the purchase of the spare parts allegedly sold to Somaco, or that OFLC had any such stock of spare parts available for sale.
11. On April 5,1948, the plaintiff made a second payment of $30,000 to OFLC under the contract referred to in finding 4. Upon receipt of that payment OFLC issued a disposal document on April 8, 1948, showing receipt of payment and authorizing the release of the ten specific aircraft which had been selected by the plaintiff and which were described in that document. Copies of this document together with theater shipping orders for the ten planes were transmitted to the representatives of OFLC at Oberpfaffenhofen, where they were signed by J oseph J ames on behalf of the plaintiff. The theater shipping orders were also signed by a representative of OFLC. Mr. James had authority under power of attorney to sign the documents acknowledging receipt of the aircraft. Upon receipt of the documents referred to above, the ten aircraft specified were removed by the OFLC from *25 the aggregate quantity in storage to a suitable location on the field where they were made available to the plaintiff for the performance of such work as was necessary for their flight.
As heretofore shown, the plaintiff’s purchase of these planes from OFLC was on the basis of “as is” and “where is.” However, for reasons of safety, the United States Air Force adopted the policy of preparing each plane for one flight and delivering it by an Air Force pilot to a point outside the military zone designated by the purchaser, and that procedure was followed with respect to the first five planes delivered under the contract. When deliveries under this procedure were seriously delayed, an attempt was made by the plaintiff to expedite the other deliveries under the contract by making arrangements with the OFLC to have the planes tested and repaired at Oberpfaffenhof en by mechanics employed by him so that they could receive the United States certificate of airworthiness at that place. This work was done by German mechanics under the supervision of Joseph James (heretofore referred to), a free-lance United States pilot, and the work was checked outside of normal working hours by the OFLC representative at Oberpfaffenhofen, Walter Lorenz, who was the holder of an airframe and engine mechanic’s license. Under CAA regulations, work to qualify a plane for a certificate of airworthiness had to be supervised by a licensed mechanic. Lorenz secured permission from his superiors to do this work after his regular working hours. Lorenz, James, and the German mechanics were employed by the plaintiff and paid by the plaintiff for the work just described in the total approximate amount of $700 per plane.
12. On or about May 19, 1948, the plaintiff prepared and filed with CAA applications for registration of the planes referred to in the preceding finding under registration numbers as follows:
NC 79825
NC 79826
NC 79827
NC 79828
NC 79829
NC 79830
NC 79831
NC 79832
NC 79833
NC 79834
*26 The portion of form ACA-500 with, respect to Bill of Sale (Part C) was completed and signed by the plaintiff. When work on the planes was completed at Oberpfaffenhofen, certificates of airworthiness were issued for these planes. Thereafter and at sometime between June 8 and June 15,1948, the ten planes identified by the above NC numbers were flown from Oberpfaffenhofen to Schiphol Airdrome in Amsterdam by pilots employed by the plaintiff. In order to fly these planes from Oberpfaffenhofen to Amsterdam, the plaintiff secured a military permit to cross the zone of occupation. The delivery of these planes in Amsterdam was in accordance with the arrangement mutually agreed upon between the plaintiff and Somaco.
While, as shown above, the plaintiff prepared and filed with the CAA applications for the registration of these planes, he did not have the registration fee of $4.00 accompanying the applications, and certificates of registration were never issued thereon. However, the applications for registration were placed in the respective planes and were there upon delivery of the planes to Somaco. The NC numbers assigned to the plaintiff, as shown above, were painted on the exterior of the respective planes. Upon the delivery of the planes to Somaco, the plaintiff did not remove the applications for registration from the planes nor have the NC numbers obliterated from the planes.
13. On May 26,1948, the plaintiff made the third payment of $30,000 as required by the contract of May 21,1947, with OFLC. On May 27, 1948, the OFLC office in Paris transmitted to Oberpfaffenhofen a disposal document (Form 450) covering the ten planes which the plaintiff desired to have delivered as a result of that payment and showing that payment had been received. That document stated: “Delivery will be effected only upon presentation of this document,” • and further stated, under a section entitled “authority,” as follows:
You are authorized to release to V. M. Oswald (Name of Purchaser) or his authorized Agent ---- (Name of Agent), the Property listed on the attached Schedule “A,” Supply Service Aircraft, Depot Germany, Case Number 21m350, Contract Number 3533, Consisting of 1 page, the property listed thereon is as *27 declared on Form SPA-3, Number See Schedule “A,” EXCEPT for the items listed below which home been deleted.
Schedule “A,” referred to in that form, was attached giving a description by engine and serial numbers of the planes selected by the plaintiff for the delivery as a result of this third installment payment.. The letter of transmittal from the OFLC representative in Paris to the OFLC representative in Oberpfaffenhofen contained the following paragraph:
2. In accordance with recent directives from TTSAFE, the subject aircraft are to be delivered on Air Corps forms 1040, instead of the Theater Shipping Orders previously used. Or, should it be more convenient, delivery of aircraft and receipt therefor may be accomplished with the two return copies of attached CFCE forms 450, in which case both such completed return copies should be returned to OFLC Aircraft Branch, APO 58, U. S. Army.
That disposal document was received in Oberpfaffenhofen in due course, whereupon the OFLC representative notified the Air Force of its receipt. When the work on the first group of ten planes, referred to in finding 11, was completed, the representative of OFLC at Oberpfaffenhofen moved the ten planes designated above in Schedule “A” into position so that the plaintiff or his representatives could begin work thereon in a manner similar to that performed on the first group of ten, and they did begin such work on or about June 14,1948.
14. On June 4,1948, the plaintiff executed applications to be filed with the CAA for this second group of ten planes, referred to in the preceding finding, under registration numbers as follows:
NC 79838
NC 79839
NC 79840
NC 79841
NC 79842
NC 79843
NC 79844
NC 79845
NC 79846
NC 79847
These applications which were on form ACA-500 were completed and filled out by the plaintiff as required, including Part C, Bill of Sale, and showing the plaintiff as the *28 applicant for tlie registration of tbe planes. These applications, like the former group of ten, were notarized at the American Embassy in Paris but the forms and NC numbers were obtained elsewhere. However, the plaintiff never filed these applications with the CAA, all of them being in his . possession at the time of a trial session in this proceeding.
15. June 8, 1948, the plaintiff secured from the United States Military Attache in Paris ten documents entitled “Aircraft Permit to use United States Military Bases,” relating to the ten aircraft referred to in the preceding finding. On the form it was stated:
This plane is being purchased from OELC and licensed at Oberpfaffenhofen by CAA. This form is requested for use of the facilities prior to departure.
It was further stated that one flight was proposed and that the United States facilities to be used were: “Oberpfaffen-hofen Air Depot (Munich) and Bhein/Main (Frankfurt) Airport.” At that time Germany was military territory and it was necessary to have these permits in order that the plaintiff might fly the planes from Oberpfaffenhofen outside the military zone.
16. The plaintiff’s work on the second group of ten which was carried out in a manner similar to that performed on the first group of ten and described in finding 11 was substantially completed by the latter part of June 1948, and they were in process of being test flown for final CAA approval as to their airworthiness when the OFLC representative at Oberpfaffenhofen received instructions from the OFLC in Paris to suspend deliveries for reasons hereinafter set forth.
17. At or shortly after the execution on May 21, 1947, of the contract involved in this proceeding and prior to June 1948, an armed conflict broke out between the Arab Government and the Israeli Government in the Middle East. In connection therewith, the United States Government became a party to a United Nations Security Council resolution condemning the sending of men or any material of war (which included aircraft) to either of those combatants. There was likewise in existence a Presidential Proclamation (No. 2776) issued March 27, 1948, which listed “aircraft, components, parts and accessories therefor” as arms, ammunition and *29 implements of war, and thereby required a license for their exportation from the United States.
18. On or shortly after the middle of June 1948, the Civil Air Attache at the American Embassy in Paris was told by a Civil Aeronautics Authority inspector that he had seen a picture in a London pictorial review, The Sphere, showing-aircraft on an airfield near Nome which bore NC registration numbers that had been assigned to the plaintiff. The caption under the picture stated that the aircraft were reportedly destined for Palestine. The Civil Air Attache reported this matter to the Department of State which instructed him to suspend further deliveries of aircraft to the plaintiff until further notice. Plowever, the Civil Air Attache never determined whether this report of the aircraft’s destination was correct or whether any of these aircraft was ever taken to Palestine.
19. On June 23, 1948, while the plaintiff was in Paris in connection with a request for clearance to fly out the group of ten planes which were then being worked on at Oberpfaf-fenhofen, the Civil Air Attache in Paris discussed with the plaintiff the incident referred to in the preceding finding. The plaintiff advised the Civil Air Attache that he had sold the planes which had previously been delivered, fifteen in number, as well as five of those which were being worked on in Oberpf affenliofen, to a Belgian firm named Somaco which represented to him that it was doing business in the Belgian Congo and that these planes were being purchased for export to and use in the Belgian Congo. "While the Civil Air Attache was at first unable to secure any information from the Belgian Foreign Office with respect to Somaco, after he furnished a street address of that company in Brussels the Belgian Foreign Office reported that such a company was registered at that address but that it had not been able to obtain information as to the exact activities of that company.
The Civil Air Attache in Paris saw the plaintiff again on June 26,1948. On that date the plaintiff showed him a copy of his contract with Somaco, permitted the Civil Air Attache to make a copy thereof, and advised him that the fifteen aircraft which had already been delivered to him by OFLC and which, as heretofore shown, had been sold to Somaco, were *30 to the best of bis knowledge then located at the following places: four in Amsterdam, two in Strasbourg enroute to Amsterdam, one at Toussus-le-Noble near Paris, one already delivered to the Belgian Congo, three at Nice, two in Borne, and one wrecked at Borne. The plaintiff also showed the Civil Air Attache a letter from Somaco tending to confirm his statement that the planes were for use in the Belgian Congo. The Civil Air Attache was not satisfied, from the information furnished by the plaintiff, when delivery was consummated and title actually transferred to Somaco of the first fifteen planes which were delivered to the plaintiff under the contract as heretofore shown.
20. On the basis of the instructions from the Department of State, referred to in finding 18, on or about July 1, 1948, the OFLC directed its personnel at Oberpfaffenhofen to suspend further deliveries to the plaintiff. At that time the second group of ten planes was still at that place and substantially all the work had been done on them which was necessary in order to enable the plaintiff to have them flown out of that military zone. Not only was work suspended on the planes but the plaintiff was not thereafter permitted to remove them from Oberpfaffenhofen.
In addition, the Civil Air Attache requested the French and Dutch authorities to ground the aircraft which had previously been delivered by the plaintiff to Somaco until he could satisfy himself as to the true ownership of these planes. In discussing the matter with the plaintiff, the Civil Air Attache called to his attention that upon the sale of these planes the plaintiff should have canceled their registration with the CAA. The plaintiff stated that he had been unaware of this requirement but that he would be glad to comply therewith. As a result, the following letter directed to the CAA at Washington, D. C., was prepared at the Embassy in Paris and signed by the plaintiff on July 2,1948:
Subject: Cancellation of Begistrations, Noorduyn UC6A-A Aircraft.
Having sold fifteen subject aircraft to Somaco, 56 Bue du Page, Brussels, Belgium; it is requested that the following registration numbers issued for these aircraft; in my name with address of 412 Bosalind Ave., Boanoke, Virginia, be cancelled.
*31 NC 74133
NC 74134
NC 79821
NC 79822
NC 79823
NC 79825
NC 79826
NC 79827
NC 79828
NC 79829
NC 79830
NC 79831
NC 79832
NC 79833
NC 79834
Registration Certificates Form ACA 500 are not available for return.
On the same day the American Embassy in Paris advised the French authorities that the United States registration certificates for the aircraft, referred to in the above communication, were no longer in force and no further validity might be attached to the registration numbers appearing on the aircraft since ownership thereof had been transferred.
Upon receiving advice that work and deliveries under the contract had been suspended, James returned from Ober-pfaffenhofen to Paris on or about July 2, 1948, and thereafter did no further work on the aircraft.
21. On July 5,1948, the plaintiff wrote a letter to Somaco in which he reported on the foregoing conferences which he had had with the Civil Air Attache in Paris stating, among other things, that the Civil Air Attache had indicated “that he would have to ground all the aircraft actually delivered to Somaco, wherever they were located, and that no further aircraft could be licensed or delivered from Storage in Germany until The American State Department were satisfied as to the ultimate destination of the aircraft, and strongly stated that he thought they were being delivered to Palestine.” The plaintiff further stated in that letter that he had informed the Civil Air Attache that he had been informed on numerous occasions by a representative of Somaco that the planes were being purchased for intended use in the Belgian Congo, and then made the following statements:
In my conversations with Mr. Fredkens, representing Somaco, he repeatedly told me they were purchased for intended use in the Congo and asked that the NC license be allowed to remain on the plane until they arrived in the Congo, at which time the American NC’s would be removed and the Carnets du Passage and Intavia Credit cards for each plane would be returned to me.
*32 In view of tbe facts above stated, tbe writer feels that some new arrangement must be made with regard to the delivery of the remaining five aircraft sold under this contract and that permission be obtained from the American State Department, thru Mr. Bailey for delivery to the Belgian Congo, or the contract should be cancelled or terminated with the delivery of the fifteen planes already accomplished.
I trust you appreciate my position in the matter and the entire affair has placed me in a very delicate position with the American State Department thru Mr. Bailey, Civil Air Attache, American Embassy, Paris, and at the present time is placing in jeopardy the entire contract for the balance of the planes purchased more than a year ago and with no thoughts or intention of selling them to the Jewish Agency, Palestine, or any of their agents.
22. The Civil Air Attache, referred to above, was on vacation and out of Paris from about the time of the events referred to in the preceding finding until sometime in the following month, and the plaintiff was likewise away from Paris at that time. Before leaving on his vacation, the Civil Air Attache was advised on June 30, 1948, by the American Embassy at The Plague that two of the four planes which had been at an airport in that area and which were registered in the plaintiff’s name had taken off that afternoon for Paris via Brussels. At the same time the American Embassy at The Hague advised the Civil Air Attache that that Embassy had been told by Fred Lewis (sometimes referred to herein as Tursz-Fredkens) that he (Fred Lewis) was the European representative for aviation purposes for the State of Israel and had chartered these and other aircraft involved in this contract from Somaco. While at Nice on his vacation, the Civil Air Attache inquired at the airport as to whether the planes described in finding 19 as having been flown to that place were still located there, and was informed that they had departed but the authorities at Nice were unwilling to give any information as to their destination.
Shortly after the Civil Air Attache returned from his vacation, the plaintiff undertook to have the suspension of deliveries under the contract withdrawn but was advised by the OFLC office in Paris that the matter was in the hands of *33 tbe Policy Committee on Arms and Armaments of the State Department in Washington, D. C. The plaintiff accordingly went to Washington in October 1948 and entered into negotiations with various individuals in the State Department looking to the resumption of deliveries under the contract. As a result of these negotiations, the State Department prepared an amendment to the contract which was signed by the Acting Foreign Liquidation Commissioner and by the plaintiff on November 23, 1948. That amendment read as follows:
The Foreign Liquidation Commissioner, Department of State (hereinafter referred to as the Commissioner), acting for and on behalf of the United States of America and David M. Miller, Assignee of Victor M. Oswald (hereinafter referred to as the Purchaser), do hereby agree to amend Contract W-ANL(ETO-II)-3533 as follows:
1. The Purchaser hereby agrees he will not lease, charter, loan, sell, or otherwise dispose of the remaining undelivered aircraft and/or component parts thereto, of Contract W-ANL (ETO-II) -3533 without prior consent of the Department of State of the Government of the United States.
2. The Purchaser hereby agrees that upon completion of any disposal action approved by the Government of the United States the Purchaser will report same within fifteen (15) days to the Department of State of the Government of the United States.
3. The Purchaser further agrees that the remaining undelivered aircraft sold under this contract will be registered with the Civil Aeronautics Administration of the Government of the United States and the registration numbers reported to the Department of State of the Government of the United States prior to removal from the location at which delivery will be made.
4. The Purchaser agrees that failure to comply with any part of this agreement will constitute a breach of contract and title to all the planes subject to this amendment will thereby revert to the Govermnent of the United States; and, in such event, the Purchaser agrees, upon demand, to make delivery of the planes to the United States Government. In event of failure to make such delivery, the Purchaser agrees to pay to the United States Government Three Thousand Dollars ($3,000) as liquidated damages in the instance of each plane, without limitation on the right of the United States to initiate *34 and prosecute further proceedings as may be necessary to obtain possession of the property.
5. All terms and provisions of Contract W-ANL-(ETO-II)-3533 not expressly amended hereby remain effective and David M. Miller, the assignee, agrees to perform all the obligations of the Purchaser as specified in the contract and this amendment.
On the same day the State Department advised the OFLC in Paris as follows:
As stated in Cable WAR 92762 of 17 November 1948 the Policy Committee on Arms and Armaments, upon being advised that David M. Miller, Assignee under the contract, would agree not to resell any of the subject planes without prior approval of the Department, agreed to reconsider the Committee’s action taken in this matter on 22 October.
In view of the above, this office submitted to PCA a draft of a proposed amendment to the subject contract which was designed to safeguard the interests of the United States. At its meeting of 19 November 1948 the Policy Committee on Arms and Armaments approved the contract amendment as proposed.
On 23 November Mr. Miller came to this office and signed the amendment and Mr. F. T. Murphy, Acting Commissioner, signed on behalf of the United States. Signed copies of this amendment are enclosed for your information and use.
Any disposal documents and certificates of title transferring title to any of the planes not previously delivered under this contract, as amended, shall specify that title to the plane or planes delivered cannot be retransferred without prior approval of the Department of State of the United States. It is suggested that your office forward to the Civil Air Attache in Paris a copy of the Department approved amendment to the subject contract and advise the Attache whenever deliveries are made under this contract, as amended, giving proper identification symbols or numbers.
It is anticipated that you will hear from Mr. Miller or his representative at an early date and that deliveries may be made in a normal and orderly manner.
The plaintiff returned to Paris during the first week in December 1948 and went to the Paris office of OFLC for the purpose of seeing whether the amendment to his contract and notice referred to above had been received and to arrange *35 for a military permit to enter Germany. He found that the amendment and letter had been received but both he and James, the pilot heretofore referred to, were refused military permits to enter Germany and the OFLC declined to resume operations under the amended contract.
23. As shown in finding 20, James returned to Paris from Oberpfaffenhofen about July 2, 1948, upon the suspension of operations under the contract. During at least a part of July 1948, he was being paid by the plaintiff though the record is not clear as to what their employer-employee relations were during that period after the contract was suspended.
On July 13,1948, James, at the request of Tursz-Fredkens, heretofore referred to as the representative of Somaco, flew one of the planes which had previously been delivered to Somaco by the plaintiff from Le Bourget, France, to Brno, Czechoslovakia. Tursz-Fredkens paid James for making the flight, including James’ expenses. The plaintiff was not aware that the trip was being made and bore no part of the expense of such trip. In making that flight, James was later accused of having flown over the American military zone in Germany without having secured a military permit for that purpose.
24. About the time the plaintiff returned to Paris from Washington, during the early part of December 1948, the Civil Air Attache in Paris was given access to certain records of the French Air Police which indicated that one of the planes which had been previously sold by the plaintiff to Somaco and delivered by him to Somaco had taken off from Le Bourget, France, July 13, 1948, for Strasbourg, and that five planes similarly sold and delivered by the plaintiff had taken off from Nice for the same destination; and that on the same day or the following day, the planes had left Strasbourg for Brno, Czechoslovakia. At the time these flights were purportedly made, the Communist coup had taken place in Czechoslovakia. In each instance the flight plans for the above trips showed the plaintiff as the owner of the planes involved.
Upon receiving the above information, the Civil Air Attache on December 10,1948, interviewed James, the pilot *36 heretofore referred to as having made a flight to Czechoslovakia on July 13, 1948. In that interview James stated that he had made that flight while in the employ of and under instructions from the plaintiff. During that interview, when some question arose as to some detail of the trip, James stated that he would like to obtain legal advice before proceeding further and thereupon the interview was terminated. On December 13 James returned to the Embassy and stated that he wished to correct his former statement in regard to the flight to Czechoslovakia and to absolve the plaintiff of any knowledge of or connection with that flight. He further stated that the flight had been made at the request of and on instructions from Tursz-Fredkens who paid his expenses and for his services.
25. In view of the fact that the Communist coup had taken place in Czechoslovakia prior to the flight by James and that Czechoslovakia was then included with the countries behind the so-called Iron Curtain, the Civil Air Attache immediately reported the incidents referred to in the preceding finding to the Department of State in Washington along with the expression of his opinion that the first version by James of his flight to Czechoslovakia was the more credible one. About that time the Embassy at Paris as well as certain other embassies and missions in Europe recommended that no additional aircraft be made available to plaintiff because of the practical impossibility of exercising any control over them outside of the United States or the American occupation zone of Germany. Control elsewhere could be exercised only with the cooperation of the foreign governments in whose territory the planes happened to be located and having made a major issue over these planes with the Belgian, Dutch, and French authorities, it was felt by these embassies in Europe that our position would be weaker if further planes were delivered to the plaintiff and it became necessary to request their cooperation with respect to them. The foregoing information was submitted to the Policy Committee on Arms and Armaments of the State Department.
The above reports and recommendations were made without inquiry of or consultation with the plaintiff other than the conferences at and shortly prior to the suspension of the *37 contract on or about July 1,1948, and referred to in findings 19 and 20. Likewise no verification was ever bad of the destination of the planes which had been delivered by the plaintiff to Somaco other than the one plane which was flown by James to Brno, Czechoslovakia, on July 13,1948.
26. When, as a result of the reports and recommendations referred to in the preceding finding, he was prevented from taking any further action under the contract as amended, the plaintiff left Paris for Washington on December 26,1948, for the purpose of seeing what could be done to enable him to resume operations under the contract. He arrived in Washington on the following day where he remained until March 27, 1949, during which time he made various efforts with officials of the State Department to have the suspension of operations under the contract rescinded, but these efforts were unsuccessful.
27. The matter of further deliveries under the plaintiff’s contract was eventually brought to the attention of the Under Secretary of State who, on February 21, 1949, sent the following communication to the Foreign Liquidation Commissioner in Washington, D. C., who was an official of the State Department:
I have reviewed the present situation concerning the contract (Number W-ANL(ETO-II)-3533) between the Office of the Foreign Liquidation Commissioner and Mr. David M. Miller for the sale to Mr. Miller of fifty UC-64A Noorduyn-Norseman aircraft. I am informed that fifteen of the subject aircraft have been delivered as of today’s date. It is my conclusion, after a review of all the facts concerning this matter, that it would be inconsistent with the foreign policy objectives of the United States, and therefore contrary to the national interests of the United States, to make any further deliveries to Mr. Miller under this contract. Accordingly, you are directed to make no further deliveries of aircraft to Mr. Miller under the said contract.
On February 28, 1949, the Under Secretary of State addressed a further memorandum to the Foreign Liquidation Commissioner on the subject of implementation of United States Government policy respecting disposal and delivery of arms, ammunition and implements of war, which memorandum read as follows:
*38 This is to confirm that the policy heretofore followed by you of withholding deliveries under existing contracts for disposal of arms, ammunition and implements of war, as now defined in Presidential Proclamation 2776 (13 F. R. 1623, Mar. 27, 1948) until you have obtained clearance of such deliveries from the Secretary of State, acting through the Policy Committee on Arms and Armaments, should be continued and applied to all such existing contracts.
The practice of obtaining policy guidance from the Secretary of State, acting through the Policy Committee on Arms and Armaments, prior to entering into any contracts for the disposal of arms, ammunition and implements of war, as defined in Proclamation 2776, shall be continued.
28. Upon receipt of the information referred to in the preceding finding, the Foreign Liquidation Commissioner on February 28,1949, advised the plaintiff as follows:
It has been determined by the Department of State that further deliveries of aircraft to you under Contract No. W-ANL(ETO-II)-3533, would be contrary to the national interests of the United States and that consequently no further deliveries of aircraft will be made to you under said contract. This statement is made without prejudice to any other legal impediments to delivery of the planes which may exist.
There is enclosed a form of Eelease which upon execution by you and return to us will enable this office to initiate action with respect to refunding the funds which this office holds in excess of the price of aircraft already delivered.
Under the terms of the release enclosed with the letter the United States Government would have been released and discharged from all claims, damages, or causes of action arising out of the cancelation of the amended contract in consideration of the receipt by the plaintiff of whatever funds were then held by the United States in excess of the price of the aircraft theretofore delivered to him under the contract. The plaintiff refused to sign that release.
29. As shown in finding 4, under the contract of plaintiff with OFLC a price of $3,000 had been stated for each plane. At the date of the suspension of the contract, the plaintiff had made three payments of $30,000 each, that is, a total of *39 $90,000, and had received fifteen planes, five in the first group and ten in the group that is commonly referred to as the “first group of ten.”
On May 20, 1949, the OFLC refunded to the plaintiff $45,000 which amount the plaintiff accepted under protest and without prejudice to any of his claims for damages against the United States arising out of the cancelation of the contract.
30. In the meantime on May 13,1949, the OFLC sold to the Eepublic of Italy the thirty UC-64 planes which remained at Oberpfaffenhofen at a unit price of $3,225 each, that is, a total of $96,750. Included therein were the so-called second group of ten planes on which the plaintiff had done a substantial amount of work as described in finding 16. The contract with the Eepublic of Italy contained the following provisions:
5. Sauk “As Is”: All aircraft are sold “as is” and without warranty except as to title. The Commissioner makes no guarantee, warranty or representations, express or implied, as to the kind, size, weight, quantity, quality, character, description, safety or condition of the aircraft or as to its fitness for any use or purpose whatsoever.
* * * * *
10. PkohibitioN AgaiNSt TraNSFer: The Purchaser agrees that the aircraft purchased under this contract will not be sold, transferred, leased or otherwise disposed of to any third party including, but not limited to, individuals, corporations, partnerships, associations or government institutions without prior consent of the Government of the United States.
11. Nonflyabue Warranty: It is mutually agreed that the subject aircraft are being purchased for cannibalization purposes only and that they shall be used exclusively for the obtaining of spare parts and under no circumstances will the Purchaser or his assigns repair or cause to be repaired the aircraft so as to place them in flyable condition.
The difference between the total of fifty planes referred to in the plaintiff’s contract of May 21,1947, and the forty-five planes covered by the above deliveries (fifteen delivered to the plaintiff and thirty to the Eepublic of Italy) is ac *40 counted for in part by cannibalism which was practiced at Oberpfaffenhofen, that is, using parts of one plane to repair or make improvements on another plane, and in part by an error on the part of OFLC in determining how many planes were actually available for sale on May 21, 1947. If the plaintiff had been permitted to proceed with the contract to its completion without undue delay, he would have obtained a total of forty-five marketable planes.
31. As shown in finding 2, the planes herein involved were built in Canada by Noorduyn Aviation Limited. The cost to the Government of the fifty planes covered by the contract of the plaintiff with the Government ranged from approximately $35,000 to $40,000 each. The cost to the Government of the so-called second group of ten planes ranged from $35,264 to $39,256 each, of which amounts approximately $6,000 represented the cost of the engine in each plane.
32. The condition of the planes covered by the contract varied from poor to good. All of them were in such condition after the termination of the war that they were flown from wherever they were located to the disposal area at Ober-pfaffenhofen.
In his dealing with the Government under the contract the plaintiff was permitted to designate the planes which he desired to have delivered to him after each installment payment, and a reasonable conclusion from the evidence is that the better planes were selected first, thus leaving the less desirable planes on hand at the time of the suspension of the contract.
33. As heretofore shown, the unit price for these planes, under the plaintiff’s contract with the OFLC, was $3,000 per plane (finding 4). Prior to that time the OFLC had sold thirty planes of this type in Europe at prices ranging from $7,500 to $9,000 each (finding 4). The plaintiff entered into a contract of sale with Somaco for the sale to it of twenty of these planes at $6,500 per plane (finding 9). Shortly after the suspension of the contract, OFLC sold to the Republic of Italy the thirty planes then remaining on hand at a unit price of $3,225 each (finding 30).
34. The average fair market value of the 30 planes which were on hand at Oberpfaffenhofen on the date of the suspension of the contract (not considering the work plaintiff *41 had done on the second group of 10 planes) was $5,500 as they stood. However, plaintiff had spent about $700 per plane on each of the planes in the second group of 10 on the date the contract was suspended and it is reasonable to conclude that he could have sold these planes for $6,200 each. If plaintiff had gone to the expense of reconditioning, removing, selling, and performing such other services as might be required incident to their disposition, he could have sold the other 20 planes in the open market for about $6,500 per plane. This would have cost plaintiff approximately $1,000 per plane.
If plaintiff would have received the 20 planes during the period contemplated by his contract, he could have disposed of them at an average profit of $2,500 per plane whether he sold them as they stood at Oberpfaffenhofen, or whether he reconditioned them and sold them elsewhere.
35. The plaintiff devoted the greater part of his time to matters relating to his contract with OFLC from the time of its execution on May 21,1947, to May 20,1949, when refund was made to him under the contract. The reasonable value of such services was $10,000. During the same period, he incurred additional expenses on matters relating to the contract in the following approximate amounts:
Trip from Paris to Washington, D. O. (Oct. 23-
Nov. 30,1948) (see finding 22) :
Subsistence_ $437.50
Plane fare — round trip- 666.00
-$1,103. 50
Trip from Paris to Washington, D. O. (Dee. 26,
1948-Mar. 27,1949) (see finding 26) :
Subsistence_1,125. 00
Plane fare — round trip_ 666.00
- 1,791.00
Telephone and cable expense- 500. 00
Two trips to Amsterdam_ 400.00
One trip to Geneva_ 100.00
Two trips to Zurich_ 200. 00
Two trips to OberpfafCenhofen_ 300.00
Two trips to Madrid_ 500. 00
One trip to London_ 150.00
Total- [1]5,044.50
*42 CONCLUSION or LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law plaintiff is entitled to recover, and it is therefore adjudged and ordered that he recover of and from the United States the sum of eighty-two thousand dollars ($82,000), plus an amount computed at a rate of 4 percent per annum on $62,000 from July 1, 1948, to May 20, 1949, and on $32,000 from May 20, 1949, to the date of payment.

 The items set out in this finding were not considered in arriving at the average profit of ?2,500 per plane referred to in the preceding finding.